

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7195 | **DATE** | 6/20/2003 |
| **CASE TITLE** | United States Securities vs. Terry L. Kirch | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons expressed in this opinion , the SEC is entitled to a judgment as a matter of law, so that its Rule 56 motion is granted (14-1)(and Kirch's counter-motion is of course denied). (20-1) This action is set for a status hearing at 8:45 a.m. July 16, 2003, with the SEC to have provided Kirch's counsel and this Court, not later than July 11, with a proposed judgment order contemplating the entry of that order at that status hearing. Defendant's motion for leave to file supplemental authority is denied as moot. This Court has reviewed the cited authority and finds it both (1) not on point and (2) as not calling for any different analysis or conclusions than are set out in the contemporaneously issued memorandum opinion and order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | JUN 23 2003 |
| | Notified counsel by telephone. | date docketed |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | 6/20/2003 |
| | | date mailed notice |
| SN | courtroom deputy's initials | SN |
| | | mailing deputy initials |

Document Number

27

courtroom deputy's initials

03 JUN 20 PM 2: 17

FILED 10

Date/time received in central Clerk's Office

U.S. DISTRICT COURT
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES SECURITIES AND  )
EXCHANGE COMMISSION,          )
                             )
            Plaintiff,       )
                             )
      v.                     )    No.  02 C 7195
                             )
TERRY L. KIRCH,              )
                             )
            Defendant.       )

DOCKETED
JUN 2 3 2003

MEMORANDUM OPINION AND ORDER

United States Securities and Exchange Commission ("SEC") has
sued Terry Kirch ("Kirch"), charging him with a violation of the
"insider trading" prohibitions of the federal securities laws.
As counsel for the litigants had told this Court they would do,
they have filed cross-motions for summary judgment in compliance
with Fed.R.Civ.P. ("Rule") 56 and this District Court's LR 56.1
implementing that Rule.  Each side has not only submitted
memoranda by which each has supported its or his own motion and
has responded to the other party's cross-motion, but has also
filed a reply relating to its or his own motion.  Those
memoranda, together with some other filings by the litigants,
have brought the case into a posture ripe for judicial
resolution.

When Kirch's counsel advised during the course of a January
14, 2003 status hearing that a cross-motion under Rule 56 was in
the offing, this Court cautioned counsel for the parties that
strict adherence to Rule 56 principles sometimes resulted in a

court's perception that one or more potentially outcome-determinative facts was or were in dispute even though the litigants had not thought so, in which event both sides' hopes of a disposition short of trial would be defeated. In response to this Court's inquiry whether the parties would be amenable to this Court's resolution of any such factual issues if that were to develop, Kirch's counsel immediately responded in the affirmative, and SEC's counsel have since provided their consent to such treatment.

What follows then in the <u>Facts</u> section of this opinion and in the analysis that follows is in accordance with that joint agreement. For example, where there are some divergences between Kirch's characterizations of events and those of Jack Noonan ("Noonan")--another member of the Roundtable referred to in the <u>Facts</u>--this Court has credited Noonan's sworn version as that of an unbiased witness with no self-interest and with no reason to shape the facts to favor one side or the other.[1]

<u>Facts</u>

Kirch is now a senior vice president of a publicly-traded company, Trizetto Group, Inc. ("Trizetto"). In the fall of 1999,

---

[1] Noonan's March 2003 sworn declaration (SEC Ex. 23, cited here as "Noonan Decl. ¶--") is attached to this opinion and is incorporated by reference. Although one portion of that declaration is expressly quoted in this opinion, the nonquoted portions are also credited by this Court and have been taken into consideration in reaching its decision.

when the operative events at issue in this litigation took place,[2] he was the President, owner and founder of a privately-held company, Resource Information Management Systems. At that time he and a handful of others (some ten or so in number) who were also key officers in companies engaged in the computer software business[3] were members of an unincorporated group calling itself the "CEO Roundtable" or "Software Executives Roundtable" ("Roundtable") that met twice a year for sessions lasting two, three or four days.

Although some part of those meeting days are spent in social or recreational activities, their fundamental purpose (and that of the Roundtable itself) is business-oriented: About six hours each day are spent in members-only meetings (to the exclusion of spouses, other family members and friends). Because the very nature of the meetings--to exchange information and ideas that are or could be of utility to the members in their respective businesses--is such as to call for imparting information of a

---

[2] Any dates mentioned in this opinion without a year designation refer to the year 1999.

[3] Typical of Kirch's often disingenuous approach to this litigation--and indeed to the entire matter at issue--is his quibbling disclaimer of the SEC assertion in its LR 56.1(a)(3) statement of assertedly undisputed material facts that the Roundtable members were "chief executive officers of software companies." According to Kirch, he was not--and in purporting to deny that statement he refers to paragraph 2 of the same SEC LR 56.1 statement, which he does not dispute, that he was his company's "President, owner and founder."

sensitive and confidential nature, the Roundtable and its members
had an express policy and understanding that such matters were
indeed to be kept confidential. As Noonan Decl. ¶4 states:

> It is a definite and fundamental understanding of the
> Software Executive Roundtable that matters of a
> confidential or sensitive nature are to be kept
> confidential. This has always been the definite and
> fundamental understanding of the Software Executive
> Roundtable.

To the identical effect, President-CEO of ShowCase Corporation
("ShowCase") Kenneth Holec ("Holec") states in Paragraph 3 of his
February 21, 2001 sworn declaration, which this Court also
credits:

> It is a definite policy and fundamental understanding
> of the software roundtable that matters of a
> confidential or sensitive nature are to be kept
> confidential. When I make a presentation before the
> software roundtable that included confidential
> information, it is my practice to remind the group of
> the sensitive and confidential nature of the material I
> am about to present and the need to keep the
> information confidential.[4]

---

[4]  [Footnote by this Court]  Again Kirch has been
considerably less than forthright on a highly material fact in
this litigation.  During his testimony under oath during the SEC
investigation of the subject, he expressly agreed "that it was a
definite policy of fundamental understanding of the Software
Round-Table that matters of a confidential or sensitive nature
are to be kept confidential."  But during this litigation he has
sought to waffle on that score, not only on the premise that the
"Roundtable had no written policies regarding confidentiality"
but by attempting to distinguish between the Holec statement just
quoted in the text and a portion of Holec's further sworn
statement (his Decl. ¶9) next quoted in the text.  That weak
effort truly advances a distinction without a difference, and
Kirch's effort to cavil at the SEC's accurate presentation--which
is based not only on Noonan's and Holec's sworn statements but
also on Kirch's own sworn admissions--does him no credit.

As just indicated, Holec was another member of the Roundtable during 1999. Here is how he described his critical presentation at the October 1 Roundtable meeting (his Decl. ¶9), an account that this Court credits as accurate in all respects:

> At around 10:15-11:00 a.m., I gave my presentation to the software roundtable concerning ShowCase Corporation. I began my presentation by stating that the information I was going to present was confidential and had not yet been publicly announced. My presentation lasted approximately 20-30 minutes and included a discussion of the fact that ShowCase Corporation would not make its earnings projections for the second quarter. I presented this confidential information to the software roundtable as I sought their input as to how to publicly announce this information and how to deal with employee and customer concerns. After my presentation, I believe the software roundtable took another break.

Indeed, Noonan's account of that presentation (Noonan Decl. ¶6) is entirely consistent with Holec's version, with the addition (also credited by this Court) that Kirch had himself taken part in the discussion of the business issue that was invited by Holec (and was the reason that Holec disclosed the nonpublic information about corporate earnings in the first place).

For his part, Kirch agrees with a portion of the Noonan (and hence the Holec) description, while he does not dispute the balance because of what he says is his insufficient recollection of the event. And as that consistent description makes plain, Holec's confidentially communicated earnings information bode ill--at the least--for the price of ShowCase's stock in the marketplace when that information became public.

For some time Kirch had been a ShowCase stockholder as the result of market acquisitions (its stock was NASDAQ-traded). Almost immediately after Holec's completion of his presentation in the late morning of October 1, Kirch called his broker Piper Jaffray (at 11:42 a.m. that same morning) and placed an order to sell 8,500 shares out of his 15,000 share holding. As anticipated, when the confidentially-communicated information was released to the public a few days later (after the market close on October 4), the ShowCase stock price dropped precipitously-- from $9.50 to $4 a share in just one trading day. According to the SEC, Kirch's sale of his stock for nearly $80,000 thus avoided losses of more than $45,000 (Kirch does not question the fact of his avoidance of loss, responding only that he cannot admit the exact amount specified by the SEC because of uncertainty as to which date the agency used to compute the final stock price).

That then provides the framework for this Court's consideration of the issues. It is true that Kirch has earlier dissembled in a number of other significant respects--for example, (1) when Holec first called Kirch and asked him about his stock sale (in response to an NASD inquiry), Kirch falsely said he had traded on the day or night before Holec's Roundtable presentation, then during his testimony in the course of the SEC's investigation Kirch shifted to a suggestion that the trade

6

was made "early in the morning" (which would again have placed it before Holec's presentation), and he finally owned up to the actual time sequence only when he was confronted with the recorded time of his telephone call to the broker; (2) during the SEC's investigation Kirch also testified that he did not learn of ShowCase's failure to meet the analysts' earning estimates until after the information had become public, but he was then forced to concede otherwise when he was confronted by contradictory documentary evidence; (3) he has claimed ignorance of the law regarding insider trading, even though his sworn testimony during the SEC investigation was directly at odds with that; and (4) his version of the Roundtable's purpose has shifted appreciably by laying emphasis on the social aspects of the Roundtable (including a recharacterization of its sessions as "informal gatherings" rather than meetings)--a shift in emphasis that occurred as he became aware that the Roundtable's purpose might be a material factor in this case. But at the final reading, Kirch has ultimately come clean in all respects (though he retains his different spin on the Roundtable's activities), so that what has been recited up to now forms the proper matrix for this opinion's legal determinations.

### Kirch's Liability

It has long been established that "insider trading" in the literal and classic sense--trading in a corporation's stock by a

corporate insider on the basis of material nonpublic information--violates Securities Act §17(a)(15 U.S.C. §77q(a)), Securities Exchange Act §10(b)(15 U.S.C. §78j(b)) and Rule 10b-5 under the Exchange Act. What has then followed from that fundamental proposition, in a kind of evolutionary process, has been the extension of the same type of prohibition to persons who, although not insiders as to the issuer itself, come into possession of nonpublic information and proceed to act on it by buying or selling shares in the issuer. And part of the analysis as to the potential liability of such persons examines not only the circumstances surrounding their acquisition of the nonpublic information but also the requirement that their actions in trading on that information must have been taken with scienter (the groundbreaking opinion in <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 n.12 (1976) provides a working definition of "scienter").

As to such noninsiders in the classic sense, the courts have developed the "misappropriation theory" that has been articulated and approved in <u>United States v. O'Hagan</u>, 521 U.S. 642, 652-53 (1997) (internal quotation marks omitted):

> The "misappropriation theory" holds that a person commits fraud "in connection with" a securities transaction, and thereby violates §10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information.

*      *      *

> The two theories are complementary, each addressing
> efforts to capitalize on nonpublic information through
> the purchase or sale of securities.  The classical
> theory targets a corporate insider's breach of duty to
> shareholders with whom the insider transacts; the
> misappropriation theory outlaws trading on the basis of
> nonpublic information by a corporate "outsider" in
> breach of a duty owed not to a trading party, but to
> the source of the information.  The misappropriation
> theory is thus designed to protect the integrity of the
> securities markets against abuses by "outsiders" to a
> corporation who have access to confidential information
> that will affect th[e] corporation's security price
> when revealed, but who owe no fiduciary or other duty
> to that corporation's shareholders.

Where the parties part company is as to whether Kirch fits into
that theory.

Before this opinion turns to that issue, though, a few
critical and undisputed aspects of the analysis should be
confirmed.  First, there is no question that the negative
information about ShowCase was material--that was obvious up
front, and it was confirmed dramatically when, after the public
announcement was made following the market close on October 4
(with the stock then at $9.50 per share), the next day's closing
price plummeted to $4 per share.  Second, Kirch's attempted
earlier wriggling on the subject does not obscure the now
undisputed fact that he owed--and he knew that he owed--Holec and
the other Roundtable members an express duty to keep confidential
all of the business information that he learned at the Roundtable
meeting.

Next, even though Kirch's acknowledgments do not extend to

the legal consequences of the clearly established facts, it is beyond dispute that his sale of the ShowCase shares involved scienter on his part. That is at the core of the "misappropriation theory," as exemplified not only by the earlier-quoted portion of the O'Hagan opinion but also by such further exposition in O'Hagan as this (521 U.S. at 656):

> A misappropriator who trades on the basis of material, nonpublic information, in short, gains his advantageous market position through deception; he deceives the source of the information and simultaneously harms members of the investing public.

For this Court that combination of factors unquestionably brings this case well within the purview of the analytic thrust of such cases as United States v. Chestman, 947 F.2d 551 (2d Cir. 1991)(en banc)(a decision interestingly sought to be relied on by both litigants), United States v. Falcone, 257 F.3d 226, 234-35 (2d Cir. 2001)(a decision invoked by SEC and sought--unsuccessfully--to be distinguished by Kirch) and SEC v. Yun, 327 F.3d 1263 (11th Cir. 2003), a case decided since the completion of the parties' briefing. What is plain to this Court, and what it holds, is that the "duty of loyalty and confidentiality" owed by the outsider (in this instance Kirch) to the person (in this instance Holec) who shared confidential information with him or her (the quoted phrase is from O'Hagan, 521 U.S. at 652) is not limited to fiduciary relationships in the limited sense that requires such factors as control and dominance on the part of the

fiduciary. Instead that "duty of loyalty and confidentiality" can be (and is) created by precisely the type of policy and expectations that are present in the Roundtable relationships here (see the discussion in Yun, 327 F.3d at 1272-73).[5]

This Court is unpersuaded by Kirch's attempted reliance on United States v. Kim, 184 F.Supp.2d 1006 (N.D. Cal. 2002). Quite apart from the principle about which our Court of Appeals is fond of reminding those who labor in the District Court vineyards--the principle that the opinions written by District Judges are nonprecedential and are thus entitled to no more than a modicum of consideration en route to a decision (see most recently the concluding portion of the opinion in Bank of America, N.A. v. Moglia, 2003 WL 21254909 (7th Cir. June 2))--and even apart from what this Court perceives as critical distinctions between the Young Presidents Organization and the situation at issue in Kim and the Roundtable and the situation presented in this case, this

---

[5]    In part the Yun court sides with the Chestman dissent on the premise that the majority in the latter case "too narrowly defined the circumstances in which a duty of loyalty and confidentiality is created between husband and wife" (Yun, id. at 1272).    In addition Yun, id. at 1272 n.22 pointed out that the Chestman majority itself had stressed it was determining the scope of the required relationship between tipper and tippee in the context of a criminal case, indicating that a less rigorous approach might be called for in the context of a civil case such as this one.    This Court finds it unnecessary to choose between the Chestman majority on the one hand and the Chestman dissent and the Yun opinion on the other, for it holds that the situation here would satisfy even the more demanding approach of the Chestman majority.

Court subscribes to the principle that the Roundtable relationships and the circumstances of Holec's disclosure of nonpublic information under such express confidentiality constraints call for application of the "misappropriation theory" here.

Even though this further point is not made a condition of the conclusion reached here (and is hence dictum in the purest sense), it is significant to note that disclosures of material nonpublic information of the type at issue here, made by an insider such as Holec with the knowledge (although it was not his intent) that the persons to whom the information was being imparted could take advantage of that information by trading in the stock, might--in addition to the present consideration of the tippee's liability, as discussed in the cases referred to here--arguably put the tipper such as Holec at risk under the securities laws. To be sure, the caselaw dealing with tipper responsibility speaks of the tipper's intent that the tippee make use of the inside information by trading in the issuer's stock (see, e.g., such cases as United States v. McDermott, 245 F.3d 133, 138-39 (2d Cir. 2001) and Falcone, 257 F.3d at 233-34). But that carries with it the real prospect that such trades by a tippee can embroil the tipper in investigations or litigation (or both) that can force him or her to demonstrate the absence of the prohibited intent--a burden that imposes the certainty of

12

considerable expense and the possibility of losing on that issue (and consequent liability). Surely the potential for such abuse on the part of the recipient of nonpublic information by the irresponsible act of trading on that information further heightens the notion of a duty owed to the disclosing party by that recipient (in this instance Kirch) not to trade on the nonpublic information (a further demonstration of the "duty of loyalty and confidentiality" that O'Hagan has identified as the hallmark of the "misappropriation theory").

This Court therefore holds Kirch liable for his violations of the Securities Act and the Securities Exchange Act. It turns then to the question of appropriate relief, for which purpose it begins with two of Kirch's representations as set out in his initial Memorandum of Law at 25 (what are quoted here are Kirch's headings of two successive sections of that memorandum):

> 5. If The Court Finds That He Violated Securities Laws, Kirch Will Assure That No Future Violations Occur.

> 6. Kirch May Maintain That His Actions Were Proper But Will Accept That His Conduct Was Wrongful Should The Court Make That Finding[6]

---

[6] [Footnote by this Court] This Court reads Kirch's representations as an agreement to accept this Court's determination as to liability, although it recognizes from his counsel's further arguments that he may dispute the scope of some relief that might be awarded here. This Court did not request any such effective waiver by Kirch of any right to appeal the liability issue, but it surely respects and accepts Kirch's undertaking in that respect. What follows in the next section of this opinion is premised in important part on that undertaking.

## Remedies Against Kirch

As is often true in insider trading cases, the SEC presses for the issuance of a permanent injunction against Kirch. In turn Kirch's counsel argue fervently against such relief, devoting fully 40% of their initial Memorandum of Law--12 pages out of an oversized 30-page memorandum[7]--to those arguments. Although this opinion has already reflected this Court's discomfiture at Kirch's laggard steps in coming to grips with his conduct here (including his dissembling in a number of respects), and although it finds his action in trading on the nonpublic information to have been obviously motivated by greed, it is also aware that Kirch is a one-time rather than a repeat offender. And there is no question that this experience has to have been both expensive and sobering for him.

Under all of the circumstances, this Court is prepared to credit Kirch's current assurances as to the nature of his future conduct (including his undertaking to have his attorneys review all future trades in stock with which he has any relationship). In light of those considerations and given Kirch's assurances, and also mindful of the draconian aspects of the sweeping type of permanent injunction that is sought by SEC (an injunction that

---

[7] That emphasis is even more striking in light of the fact that Kirch's original memorandum was devoted not only to opposing SEC's summary judgment motion but also to advancing Kirch's cross-motion under Rule 56.

would, for example, require Kirch to sever his relationship with Trizetto), this Court denies the SEC's motion for that type of relief.[8]

As for the prospect of granting the SEC's request for financial relief, Kirch's Mem. 28 recognizes the propriety of his being saddled with a disgorgement obligation in the sum of $45,687.50 as calculated by the SEC--after all, such a payment on his part amounts to no more than his giving up the money that he derived in violation of the securities laws by unloading the ShowCase stock when he did, rather than after the decline in the stock's value that was occasioned by the public release of the previously-confidential information.

That leaves two other monetary considerations for resolution: (1) the potential application of prejudgment interest on the disgorgement and (2) the determination of a possible civil penalty. This opinion turns finally, then, to those issues.

As to the former, Seventh Circuit law consistently teaches that the norm in federal question cases (and certainly the permissible rule in a district court's discretion) is to award such prejudgment interest--and indeed preferably to award it at

---

[8] This Court is also aware of Kirch's ouster from the Roundtable, and its order here will also be conditioned on his commitment not to seek or to obtain reinstatement in that organization at any time in the future.

the compounded prime rate (else a wrongdoer will have gained an unwarranted profit from the use of the ill-gotten gains in the interim)--see, e.g., such recent cases as <u>Fritcher v. Health Care Serv. Corp.</u>, 301 F.3d 811, 819-20 (7th Cir. 2002) and cases cited there as to prime-rate prejudgment interest generally, and <u>Am. Nat'l Fire Ins. Co. v. Yellow Freight Sys., Inc.</u>, 325 F.3d 924, 937-38 (7th Cir. 2002) and cases cited there as to the award of such interest at the compounded prime rate. This Court orders the addition of such compounded prime-rate interest to the disgorgement amount payable to the SEC.

As for the possible imposition of a civil penalty, the SEC asks for treble damages. Kirch responds by pointing to the factors identified in <u>SEC v. Youmans</u>, 729 F.2d 413, 415 (6th Cir. 1984), a case invoked by the SEC itself, and to cases that impose a much smaller penalty under circumstances just as egregious as (or more egregious than) those involved here.

This Court rejects any notion of effectively rewarding Kirch by imposing no civil penalty at all, a result that would impermissibly increase the incentive to violate the law by insider trading. After all, if an offender is not caught he or she gets away scot free with the improperly obtained profit--so it is obviously necessary to up the ante well beyond mere disgorgement when an offender <u>is</u> brought to task. After full consideration of the competing considerations, this Court holds

that a civil penalty of three-fourths of the disgorgement figure (including accrued interest) is an ample response to Kirch's original conduct and to the dubious aspects of his conduct after the insider trading violation, while at the same time such a penalty serves an exemplary purpose in providing a disincentive both for Kirch and for any like-minded other persons.

Conclusion

For the most part, there is no genuine issue as to any material fact--and as to the few areas in which the parties have expressed different perceptions of the facts, they have agreed to this Court's resolution of such issues. For the reasons expressed in this opinion, the SEC is entitled to a judgment as a matter of law, so that its Rule 56 motion is granted (and Kirch's counter-motion is of course denied). Based on the factual findings and conclusions that have been set out here, this Court therefore:

1. holds that Kirch violated the securities laws by his improper sale of 8,500 shares of ShowCase stock;

2. denies SEC's motion for a permanent injunction against Kirch;

3. orders Kirch to pay the SEC the disgorgement sum of $45,687.50, plus prejudgment interest at the prime rate compounded from October 1, 1999 to the date of judgment; and

4. orders Kirch to pay the SEC a civil penalty equal

to three-fourths of the amount calculated in paragraph 3. This action is set for a status hearing at 8:45 a.m. July 16, 2003, with the SEC to have provided Kirch's counsel and this Court, not later than July 11, with a proposed form of judgment order contemplating the entry of that order at that status hearing.[9]

Milton I. Shadur
Senior United States District Judge

Date: June 20, 2003

---

[9] As stated earlier, this opinion has been written on the premises (1) that Kirch is accepting this Court's resolution of the liability issue against him and (2) that he accedes to his payment of the full disgorgement amount, plus (a) prejudgment interest (Kirch Mem. 28) and (b) "at most a small less-than-one-times civil penalty" (id. at 30). If Kirch seeks to back away from any of those undertakings, his counsel must promptly hereafter notify SEC's counsel and this Court so that the issues dealt with here might be reconsidered in that light. At the same time, this Court recognizes that Kirch's acceptance of the premises stated in this footnote is the equivalent of his entry into a consent decree on those terms. In that sense equity would appear to require that he not surrender his ability to contest the amount of the civil penalty unless the SEC is also prepared to accept all of the terms of the judgment order provided for in the text--and the SEC's counsel are required to notify Kirch's counsel and this Court, on or before July 11, as to the SEC's willingness to do so.

# DECLARATION OF JACK NOONAN

I, Jack Noonan, declare under penalty of perjury, in accordance with 28 U.S.C. §1746, as follows:

    1.   I am the President and Chief Executive Officer of SPSS, Inc., ("SPSS") a publicly traded company. SPSS is a computer software company, specializing in predictive analytics and data mining.

    2.   At least three meetings before October 1, 1999, in either late 1997 or early 1998, I joined a group of approximately ten to eleven chief executive officers of software companies ("Software Executive Roundtable"). When I joined the Software Executive Roundtable, it was presented to me as a forum almost akin to an outside Board of Directors, serving as a sounding board on issues, and providing an independent view and advice.

    3.   The Software Executive Roundtable meets twice yearly. In advance of each meeting, the members e-mail questions to the meeting's sponsor, who would then prepare a list of the questions. There are typically six to ten members at each meeting, and the meetings are pretty intense. At the meetings, which run about six hours a day for two or three days, each member would give an update presentation, and then the group would go through the questions. The information presented and discussed by the Software Executive Roundtable members is often sensitive and confidential and was expected to be kept confidential.

    4.   It is a definite and fundamental understanding of the Software Executive Roundtable that matters of a confidential or sensitive nature are to be kept confidential. This has always been the definite and fundamental understanding of the Software Executive Roundtable.

    5.   From September 30, 1999-October 2, 1999, there was a meeting of the Software Executive Roundtable held at the Inn at National Hall in Westport, Connecticut

1

("Connecticut roundtable"). I attended this meeting, as did others including Kenneth Holec and Terry Kirch.

6.   At the October 1, 1999 Software Executive Roundtable meeting, Holec gave a presentation concerning ShowCase Corporation. Holec's presentation included a discussion of the fact that ShowCase Corporation would not make its earnings projections for the second quarter. Holec stated that he was not going to make his number; that he needed help with how to communicate that information to the street and to his employees; and a discussion ensued. Kirch took part in these discussions.

7.   It did not surprise me that Holec put this issue before the group, because sensitive matters like that were discussed all the time at meetings of the Software Executive Roundtable. In fact, at the last meeting I attended, one of the members discussed the hiring of a new CEO, a very confidential matter. Similarly, the various members may discuss "metrics" – or different ways of measuring productivity or pay during meetings of the Software Executive Roundtable. This is very valuable confidential information and is not information I would share with the outside. Other examples of confidential topics discussed during meetings include the hiring and firing of employees, methods of raising capital and the selection of investment bankers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true to the best of my knowledge.

Executed this __ day of March 2003 at Chicago, Illinois

*Jack Noonan*
Jack Noonan

2